You may. Thank you, Your Honors, and may it please the Court. I'm Jonathan Sternberg and I represent the appellant Dennis Ryno. Mr. Ryno appeals from a summary judgment in favor of Waynesville, Missouri, police officers on his Section 1983 claims against them for violating his Fourth Amendment rights against unreasonable seizure and search. The district court didn't reach the defendant's assertions of qualified immunity but instead held against Mr. Ryno on the merits of his Fourth Amendment claims. Your Honors, summary judgment was error. This Court should reverse the district court's judgment and remand these claims for trial. The district court fundamentally failed to view the facts most favorably to Mr. Ryno and draw all inferences in his favor. In fact, it copied and pasted the defendant's statement of facts into its order without addressing any of Mr. Ryno's many disputes or additional facts. Viewing the record most favorably to Mr. Ryno and drawing all inferences in his favor, genuine disputes of material fact preclude summary judgment on both his seizure and search claims. First, so viewed, Chief Daniel Cordova and Officer John Meyer intentionally fabricated their basis for probable cause to arrest Mr. Ryno, which statements they knew were false at the time and knew Mr. Ryno had not committed an offense. As the Supreme Court first held in the Franks case in 1978 and reconfirmed in the Manuel case in 2017, this violated Mr. Ryno's right to be free from unreasonable seizures. Second, so viewed. Counsel. Yes, Your Honor. Counsel, before you really get into your presentation, I wanted to ask, did the order of the district court conclude the case or are there other claims that are still pending in the district court? No, it did conclude the case. There had been a series of other counts besides these three claims that were left, but those had been dismissed in a prior order, which we aren't challenging in this appeal. Okay. So the case ended. Yes. The case ended. All right. Thank you. It's a final judgment subject to this Court's review, and I don't think the appellees contest that either. Thank you. Certainly, Your Honor. All the claims have been dismissed with prejudice. Yes. Dismissed or summary judgment with prejudice. Either way, all of them. That's correct. The three for summary judgment were unreasonable search, unreasonable seizure, and conspiracy to commit those offenses. So I'd like to begin with the claims about Mr. Ryno's arrest. Section 1983 provides relief when law enforcement officers has violated a person's right to be free from unreasonable seizures guaranteed in the Fourth Amendment. An officer violates this right and is subject to 1983 liability when he fabricates allegations to create probable cause to arrest a person without a warrant. Here, Chief Cordova and Officer Meyer arrested Mr. Ryno on October 30, 2014, without a warrant, for the alleged harassment, that was the charge harassment, of Crystal Ainsley. They gave, and the district court accepted, three bases for probable cause for that arrest. First, that Ms. Ainsley had told officers that she was in fear for her life from Mr. Ryno's stalking. Second, that Chief Cordova had looked at officers' prior reports concerning Mr. Ryno to begin surveillance of him. And third, that the officers performed that surveillance over multiple days in October 2014 and observed him following or stalking Ms. Ainsley. Your Honors, viewing the record most favorably to Mr. Ryno and drawing all inferences in his favor, these three bases were all false and fabricated intentionally. First — Counsel, there's a big difference between an inaccuracy and deliberate falsehood. And Mr. Ryno's brief contains some very strong language alleging deliberate falsehoods, fabrications. What evidence have you provided that any of these inaccuracies were deliberate or that the officers deliberately lied? Certainly. Let's start with the statement that Ms. Ainsley had told officers she was in fear for her life. That was untrue, it was false, and it was fabricated. And the evidence for that is that, first, in their probable cause report, the officers had stated that. They did state that, and the district court accepted that. However, Chief Cordova — well, in fact, all three officers, Meyer, Weir, and Cordova, admitted in their depositions that Ms. Ainsley had not actually told them that. Chief Cordova, in turn, suggested it was actually the prosecutor, Mr. Hillman, who was a separate defendant on a different count, who had told — who she had told this to who then told him. But Ms. Ainsley testified she didn't actually tell the prosecutor this. Your Honor, we have to draw inferences in Mr. Rino's favor from the fact that the officers admitted ultimately that the statement wasn't true, that Ms. Ainsley had told them this. Second, Chief Cordova's statement that the prosecutor had told them this. And then, finally, Ms. Ainsley's statement that the — that she never actually told the prosecutor that. We can draw the inference that this was an intentional fabrication. Second, most importantly, is — and this is on pages 41 to 50 of our brief, referencing the prior statement of the case, which has all the specific record citations to this — on every single day of the reported surveillance, as we detail, the officers outright fabricated their reports of Mr. Rino following or stalking Ms. Ainsley. I want to draw the Court especially to the final day, the day on which he was arrested, October 30th, in which the defendant's statements are demonstrably false. This is an age, of course, in which we live where officers have dashboard cameras and sometimes body cameras as well. The dashboard cameras are in the record. I put all the videos in the appendix and I encourage the Court to watch them as we ask. On that day, they suggest that — in their report, that Mr. Rino had been observed passing them as they were following Ms. Ainsley and then making a U-turn, turning around and following them. The video demonstrably shows that that simply is not true. And, in fact, on the video, the officers themselves acknowledge that he did not follow them. In fact, everything that they recount about October 30th is ultimately belied by the officer's own testimony or the videos. That is an intentional fabrication, certainly drawing the inference in Mr. Rino's favor. But those were the bases on which the district court — on which the defendants asserted that they had probable cause and on which the district court found. And, Your Honor, I'll note further, in their brief, the defendants don't address any of this at all. They don't address a single one of these demonstrable falsehoods. The final basis on which the district court — on which the defendants asserted they had probable cause and on which the district court found it was that Chief Cordova had looked at officers' prior reports concerning Mr. Rino to begin surveillance of him. Now, in their brief, that's the one thing that they concentrate on. They have a series of, let's say, 18 dates from 2012 to 2013 that would have given, under the totality of the circumstances, the officers this notion that Mr. Rino had been stalking or following Ms. Ainslie to begin this surveillance. But wasn't there also a court order? There had been an order of protection entered against him in 2014. He also had an order of protection against her as well. But the problem, though, is the dates — What was the order of protection against Rino based on? It was based on prior, in 2013, allegations that he had stalked and harassed her. Did the court find that he had stalked and harassed her? Correct. Yes. And he actually had been charged with that offense and had pleaded guilty to it. That was back in — He pleaded guilty to stalking and harassment. To harassment, to misdemeanor harassment. That's correct. And the officers knew that he had been subject to an order of protection for harassing her. It's actually not clear from at least what they're suggesting was the basis for probable cause. But it appears that at least Chief Cordova knew that. All right. At the same time, those allegations were in the past. This is October of 2014 we're talking about now. When was the order entered against him, the protective order? The order, the ex parte order, was in September of 2013. The only reports — I thought you said 2014 a minute ago. Sorry. The way it works in Missouri is you get an ex parte order of protection, and that's what he was actually charged with violating for harassment. And that was entered in September or October of 2013. And then the full order of protections, you then go to a hearing about those prior allegations, and then you have a full order of protection entered, and that was in February of 2014. All right. In the meantime, he had been charged with a misdemeanor offense and pleaded guilty. But the reports that start this surveillance, that lead to the arrests that we're talking about on October 30th of 2014, are independent of all of that. So when they allege that Chief Cordova had looked at prior reports, in his testimony, Chief Cordova says — he mentions that, oh, he remembers looking at some reports, but he says that they were from Officers Prock and Hazel. The only reports in the record that the defendants provided from Officers Prock or Hazel is one from way back when before that order of protection about these prior allegations, and the other one is after this surveillance begins. So that's not true either. In fact, in his testimony, Chief Cordova testified actually it was not any of that that led him to do the surveillance, but instead this was the prosecutor's idea. What we have here is a prosecutor directing officers to basically get Mr. Rhino at all costs. At least that's what we can infer from this record. The reason for this was Mr. Rhino had sought an order of protection against Ms. Ainslie, which in fact was entered itself later. And in the course of that, Mr. Rhino had deposed these officers and had deposed Chief Cordova as well, who had sought legal counsel in this. And in the midst of this, it's when Ms. Ainslie, on September 25th, 2014, is directed to also undergo a deposition that she had refused to, that suddenly she starts making new allegations against Mr. Rhino. But again, these are the bases for probable cause, and those are the bases that the district court accepted. But you left out the fact that he drove down a dead-end street to the location of Ainslie's friend. Let's talk about that. Where Ainslie's truck was parked. Sure. I'm happy to talk about that. Well, isn't that the incident? Isn't that the time at which he was arrested? That's not exactly what happened, at least viewing the evidence most favorably to my client. Wasn't he arrested on the dead-end street? Yes, he was. At the house next to the friend? He wasn't. You left that out. You said, well, all the other stuff you just discussed was the basis for the arrest. But that's so — what's so interesting about that, Your Honor, and I'm very glad that you asked, was that is not the basis that they alleged in the district court, and it's not the basis the district court accepted. And here's why. When they said that Mr. Rino had allegedly pulled into this driveway next to Ms. Ainslie's empty pickup truck, Chief Cordova was — said that, well, the — his original reason was that he had pulled into this driveway and this scared Ms. Ainslie. But then in his deposition, this is appendix, pages 2765 to 67 and 2772 to 74, he admitted that he — that she was not present and only later learned this from him. He admits that isn't true. Mr. Rino, in fact, stated he was going to use the street to turn around, but in their reports, Chief Cordova instead falsely — and the video shows, Your Honor, that this is false — stated that Mr. Rino — they asked him why he was there, and he responded he didn't know, but he had family in the area but couldn't say where they lived. The video shows that that's not true. The statement, in fact, that he had been in the driveway itself was false, as Officer Meyer later conceded. So that's why the defendants never actually rely on this incident in showing probable cause. Instead, it's Ms. Ainslie's alleged statement that she was in fear, Chief Cordova looking at prior reports, and the results of the surveillance, all of which were false. I note that I'm — Now, counsel, question. Were all of the officers personally involved in the arrest? Meyer and Cordova were. Weir was not. We concede that he doesn't have an unlawful seizure claim against Weir, just Meyer and Cordova. And I see that I'm into my rebuttal time. If the Court would permit me, I'd like to yield the rest for rebuttal. Very well. You may. Thank you, Your Honor. Mr. Schnake, we'll hear from you. Thank you, Your Honor. May it please the Court. The Court has hit the nail on the head with two or three questions. We've seen all the way through the brief, Mr. Sternberg just said it several times here, that we have to view the evidence and the inferences in Mr. Rino's favor. I would agree with that generally, but that doesn't mean that you can weave something out of whole cloth and create a fantastic story and say that the district court was an error because something that he comes up with in his head might be a story that works. You know, when my son was little, well, I was little. I'm 65 years old. But we had these little kids books with connect the dots. And when you draw the lines to connect the dots, the picture appears. But the picture is there before you connect the dots. What we've got here is an effort to connect the dots, but all we get when the dots are supposedly connected is speculation. Let me tell you what I'm talking about. For example, on page 44 of the brief, Mr. Rino says drawing inferences in Mr. Rino's favor, Mr. Hillman, the prosecutor, annoyed with Mr. Rino's case against Ms. Ainslie involving the police and having previously prosecuted him, produced a plan to thwart Mr. Rino and the police were eager to oblige. Well, there's no evidence that he points to that there was any motive by the prosecutor. He doesn't point to any evidence that Hillman was annoyed. He doesn't point to any evidence that says that the police, if they knew about the prior case, had any knowledge of what that motive might be. What difference does it make anyway? I mean, isn't the question as an objective matter whether there was probable cause? Yeah, that's true, Judge. I don't know what difference it makes what the motivation was for a Fourth Amendment  Well, what I'm saying is all the way through the brief, what they're saying, the facts are that this is unadulterated lying by the police. They're making that up out of whole cloth. There is no evidence to which they point that says that's true. On page 49 of the appellant's brief, Chief Cordova did not rely on any prior recent reports about Mr. Rino to begin the surveillance of him. But instead, this was Mr. Hillman's idea. Again, it's the prosecutor, but he's suing the police. In another place in his brief, in the reply brief on page 24, doing the record most favorably to Mr. Rino, it is the case of officers deciding to target someone, perhaps on order from the evidence of wrongdoing, so as to justify arresting him. Now, if in fact the fact is that these are all false statements, Mr. Rino should be asking for summary judgment in his own favor because he's established the facts. He's not doing that. Mr. Sternberg just told you in the brief says they want a reversal and a remand for further proceedings. They can't have it both ways, Your Honor. It can't be the fact this way and then say but there's a dispute of the facts. He's not required to move for summary judgment. Why don't you address what the probable cause was? He says there was no probable cause for the arrest because your man had not actually reviewed these surveillance reports and Rino actually did not turn around and follow her on October 30th. And he says you didn't rely on the fact that Rino drove down the dead end road. Could you address those three points? I think the central fact is that he in fact was there. He went down a dead end road. I went to Waynesville a while back when I came back from St. Louis and 40 years of practicing law and before that I had never been in Waynesville before. Well, we've not been there either, Ed. We don't really need your testimony. Why don't you just focus on what's in the record? The map is in the record and the map is in the brief. To get to where Mr. Rino was, where the boyfriend lives, it's on Summit Pass, which turns off the Swedborg Road. It's in the northeast part of Waynesville. To get there, you have to intend to go there because Summit Pass is a dead end. Streets off of Summit Pass, except for two that circle around, it's the same street that has two different names, but they come back to Summit Pass. You can't go anyplace once you go up there except to turn around and come back. Now, what he said on the video, and I would encourage you also to look at the videos because you will see that these are not police officers making things up. These are police officers doing their job. Well, did Rino turn around and follow Ainsley on October 30 or not? What does the record show? I don't know that he was following her, Judge. They thought he was turning around and following the police and then they decided, no, that wasn't him behind them when you watch the video. Now, the point, though, is he's under an order of protection. Mr. Sternberg said it was unclear whether the police knew about that. In fact, in Exhibit 29-3, which is his exhibit, the plaintiff's exhibit, the video of Mr. Rino at the time of the arrest, the officer specifically asks him, you're under an order of protection, why are you here by this truck? And what he says is, his story is kind of all over the board, the officer questions, this is at 40 seconds into the video, why were you at that truck right there, though? Rino, I can't see that truck from here. He backed into the driveway of the house next door and it's 100 feet or so across. He says, I can't see that truck right here. My eyesight ain't that good. He says, I looked for a place to turn around. I passed the road there that I was trying to turn down. I'm reading now from this testimony. So I backed up here to try to turn around. Officer, here's my question. You were pulling out from there and then you pulled out over here. Are you making a U-turn or something? Answer, well, I pulled down here straight. I was going to pull in and turn around and then I saw the truck there. So I backed up. At that point in the video, the officer walks over to the pickup, makes the record that, in fact, it's Ms. Andley's pickup there with her Texas license plate on it. Comes back at 2 minutes and 17 seconds into the video, the officer says, Mr. Rino was in the driveway when we first arrived on the scene. He attempted to pull out and was attempting to pull away when we first got here. And then at 3 minutes and 26 seconds, the officer essentially says, in light of the order of protection, why are you here by this truck? Answer, I don't know that that's her vehicle. Like I said, I can't see her vehicle. I can't see that well without my glasses on. Now, he just said he saw the truck. And so he backed up. Now he says he can't see the truck. He doesn't know that that's her vehicle. Counsel, you've gone through the transcript of the dash cam. But as I understand, Mr. Sternberg, he's saying that you're not relying on that for probable cause. Are you or are you not? I have to go back and look at the probable cause statement, Judge. I'm not sure that that's in there. But the issue is, I think, the central issue. Rino was doing something he was not supposed to be doing. The officers knew of his history. And I put in my brief 18 bullet-pointed circumstances under which Mr. Rino was doing this stuff for two years. And Mr. Sternberg wants us to ignore that, but I don't think you can ignore that because it's all the context. And in fact, if you look at what the police chief actually said, and it's on document 67-4, it's on page 764 of the appendix, Rino was asking the questions in the deposition. He's a bright man. He could be a lawyer. And he was his own lawyer all the way through until we got to this appeal, as I understand it. He asked the question, has any surveillance on me been conducted prior to October 23, 2014? Chief Cordova, not surveillance. I do know there were reports. He mentions reports by Kyle Prock. He mentions reports by Travis Schaefer. He didn't mention anything about Officer Hazel, as Mr. Sternberg said. But Officer Hazel had a bunch of reports as well. There are lots of them in the record. He says, now, I haven't reviewed any of this. This is six and a half years after all this happened. This deposition was in May of 2021. These things happened in October 2014. He says, I haven't reviewed any of this. He says, this is stuff I remember looking up back then. And he talks about the reports that he saw. And he says, that was all prior to my arriving at Waynesville. I just saw this in the system. So Officer or Chief Cordova was well aware of the whole history. I mean, Mr. Rino went to the extent of calling a lady at a Baptist church that he doesn't attend to ask her to go befriend Ms. Ainsley because she needed a friend. She needed a positive influence. So the lady went to her house, knocked on the door. Ms. Ainsley didn't answer the door. She didn't know her. And so the lady went to her car, wrote a note, came back, put it in front of the door, left. Ainsley looked at it. It says, I want to be your friend and mentions Dennis. So Ainsley went to the police. They tracked the lady down at the church. He said, Dennis. He never identified who his last name was. Dennis called and asked us to do this. And then he called several times to find out if I had made contact with her. He went to her house and her apartment and peeking through the windows before midnight on New Year's Eve. He drove past her apartment. He did all of this stuff. And like I said, I put 18 bullet points in the brief. We cannot ignore the history of this. And so when the officers see him there where her pickup is, it's just one more nail in the coffin that explains the totality of the circumstances, which we have to look at, the totality of the circumstances gave them reason to arrest him. And that, I think, is the central point of the whole case. He was where he wasn't supposed to be and he knew it. And it's his video that he put into evidence that shows it. And like I said, when they're trying to connect the dots, they're trying to make a case of intentional wrongdoing by the police. All the things that they do to connect these dots end up into speculation. They don't end up into the picture that would be there once you connect the dots if you make the picture. You know, you can't conspire to perform a legal act unless it's a legal act done for an unlawful purpose. And there's no allegation here that, as I read it, that there was any unlawful purpose in arresting Mr. Rino for violating the order of protection. As a matter of fact, Missouri law says that if the officers find out about it, even if they don't observe it, they're required to arrest. And then it goes over to the prosecutor and it's up to the prosecutor to decide whether he or she can make the case. But the officers did their job. So even if there was some conspiracy among the police officers, which there wasn't, it would have been for the purpose of enforcing the law. And there's nothing that I see in any of this record that shows that they were doing anything but that. Now, you know, the things that really make you wonder, and this goes to later on the search warrant issue, when they searched his car, and they're not complaining about a warrantless search of the trunk of the car, but this is on video, it's on video, it's Exhibit 29-4. They found two ropes, big wads of rope tied up. There were three rolls of trash bags, two full rolls and a partial roll. There was a shovel. There was a hatchet. There was a pickaxe. There were gloves. There was a lock. There was a jumpsuit. There were binoculars. There was a knife, among a whole bunch of other things. Now, if you're a police officer and you see all of that kind of thing, and you hear that this lady says she fears for her life, what do you think? It's possible. It's possible. Now, here's where the disconnect comes. Mr. Sternberg mentioned it a while ago. The prosecutor told Chief Cordova that she feared for her life. And Ms. Ainslie said, I never talked to the prosecutor. The disconnect is where did the prosecutor get that? But if the police hear that from the prosecutor, they're going to take it at face value. He's the chief law enforcement officer for the county. He's telling them, I want you to put this guy under surveillance, see what's going on, and that's what they did. Now, that doesn't make them a party to any wrongdoing that he may have done. Mr. Rino, as I pointed out in the brief, sued the prosecutor as well. He sued the United States Army over terminating him for this very type of thing on Fort Leonard Wood. He sued Ms. Ainslie and he sued these three officers. This isn't his first rodeo. He's been around a lot. And all of this history goes into making this decision. I think the district court got it right and I think you should affirm that. If the court has no further questions.  Thank you, Your Honor. Thank you, Your Honor. All right. We'll hear rebuttal. Mr. Sternberg. Thank you, Your Honor. In the brief time I have, I want to address, let's start with the arrest itself. You heard the transcript of the video. None of that appears in the officer's report. That wasn't the officer's basis. The officer's. Why does that matter? The question is what the assertion of probable cause is. Mr. Sternberg. Why? Why does that matter, what they said in their report? Because that's what they're asserting is probable cause. It's a warrantless arrest. Why don't we just look at all the facts that were known to them, whether they put them in the report or not, and decide whether there's probable cause. I agree. But that has to be done in a light most favorable to my client. That's the small case from this court in 2013. The officer's assertions for a warrantless probable cause has to be viewed in a light most favorable to my client. This was after an afternoon of making up, simply making up, allegations that he had followed this person. No, but you seem to be saying even though it's undisputed that he drove down the dead end road and so forth, and that incident is undisputed, we can't consider it because they didn't put it in their report. No, that's not what I'm saying at all, Your Honor. I apologize if that's how it came across. What the court has to look at is what the officer's basis was for probable cause. And here, what they said, what Chief Cordova said was that he had pulled into this street next to Ms. Ainslie's pickup truck, which scared Ms. Ainslie. Later in his deposition, he admits this wasn't true. Mr. Schnake also said that when he wasn't sure what they had argued in the district court, they did not argue that was a basis for probable cause. In the district court, they only gave these bases about her being scared and looking at prior reports. And the prior reports do not concern 18 separate dates in the past. There is no evidence of any kind. It's in our reply brief, pages 5 to 7, that there is no evidence of that. I see I'm out of time, though. Okay, very well. Thank you for your argument. I ask the court to reverse. Thank you to both counsel. The case is submitted, and the court will file a decision in due course. Thank you, Your Honor. Thank you, Your Honor.